| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | (Electronically Filed) |
| 7-ELEVEN, INC.,<br><br>         Plaintiff,<br><br>   - against -<br><br>FARRUKH BAIG,<br>BUSHRA BAIG, AZHAR ZIA<br>and ABY'S ENTERPRISES LTD.,<br><br>         Defendants. | Civil Action No.<br>2:13-cv-06354-ADS-GRB<br><br>DECLARATION OF<br>DANIEL KAEPERNIK IN<br>SUPPORT OF (A) THE<br>APPOINTMENT OF A<br>RECEIVER AND (B) A<br>TEMPORARY RESTRAINING<br>ORDER |

DANIEL KAEPERNIK declares under penalty of perjury as follows:

1. I am the North Atlantic Zone Leader of 7-Eleven, Inc. ("7-Eleven"), plaintiff in the above-captioned action. I make this declaration in support of 7-Eleven's Motion for (A) the Appointment of a Receiver, and (B) a Temporary Restraining Order.

**<u>Introduction</u>**

2. 7-Eleven franchises and operates the nationwide 7-Eleven® retail chain of convenience stores. On November 15, 2013, 7-Eleven filed a complaint against defendants, franchisees of ten 7-Eleven® stores across Long Island, seeking redress from their abandonment of the stores following their indictments on felony charges relating to alleged widespread, fraudulent conduct committed by them over a multi-year span in connection with their operation of the stores.

3. In its complaint, 7-Eleven seeks, *inter alia*, a declaratory judgment that defendants' franchise agreements are terminated. 7-Eleven, a secured creditor of defendants which owns or holds the master lease to the subject stores, now moves the Court for the

appointment of a Receiver pending such judgment, so that 7-Eleven may fully operate the stores and prevent imminent harm to 7-Eleven's name and reputation, and the goodwill developed at these established locations.

4. On June 12, 2013, a Grand Jury sitting in the Eastern District of New York issued indictments (the "Criminal Proceedings") against the individual defendants on multiple felony counts. In the indictments the individuals are charged with allegedly (i) harboring illegal aliens for financial gain, (ii) wire fraud, and (iii) aggravated identity theft, based upon acts committed in connection with defendants' operation of their 7-Eleven® stores and otherwise.

5. Upon the unsealing of the indictments on June 17, 2013, federal agents and police raided defendants' stores, making multiple arrests in connection with the indictments and taking into custody a substantial number of workers believed to have been working in the country illegally. These arrests and detainments, coupled with the apparent flight of others involved in the operation of the stores, including defendant Azhar Zia, left the stores essentially deserted and without management.

6. In cooperation with the federal authorities, and in conformance with the provisions of defendants' franchise agreements, 7-Eleven assumed operation of the stores and has been operating them continuously since June 17, 2013. However, 7-Eleven now finds that its lack of judicially-determined standing with regard to its operation of the subject stores precludes it from fully performing all of the functions necessary to operate them and thereby avoid imminent diminution in their value, and further harm to 7-Eleven.

7. Accordingly, 7-Eleven now seeks the appointment of a Receiver pending the full determination of this action. 7-Eleven also requests, pending the determination of 7-Eleven's motion, a temporary restraining order enjoining defendants from (i) entering the stores,

(ii) interfering with 7-Eleven's operation thereof, and (iii) destroying any Store-related records. 7-Eleven further seeks the appointment of a Receiver, on a temporary and emergent basis pending a hearing on 7-Eleven's motion, for the purposes of effectuating (i) the application, renewal, and/or maintenance of any and all licenses pertaining to the operation of the Stores, including but not limited to licenses to sell food, alcohol, cigarettes, tobacco, and nursery items, and (ii) 7-Eleven's operation of the Stores under such licenses.

**The 7-Eleven System and 7-Eleven Marks**

8. 7-Eleven is the premier name and largest chain in the convenience retailing industry, with approximately 10,000 7-Eleven® stores operating in North America. In the 48 contiguous states, 7-Eleven is divided into various Zones, each of which has discrete territories designated by 7-Eleven as Markets. The Stores at issue are located in what are known as Markets 2422 and 2423 in 7-Eleven's North Atlantic Zone, which are within my territory as Zone Leader.

9. 7-Eleven has developed, and is the sole and exclusive owner of, unique and uniform systems relating to the establishment and operation of 7-Eleven high-end convenience food stores (the "7-Eleven System"). The 7-Eleven System is designed to ensure that 7-Eleven® convenience stores and the services and products offered meet uniform, high quality standards. The 7-Eleven System is also designed to protect 7-Eleven's name and reputation. Accordingly, all 7-Eleven franchise agreements require franchisees to comply with the 7-Eleven System in the operation of their 7-Eleven® convenience stores.

10. To identify the source, origin and sponsorship of 7-Eleven® convenience stores and the services they offer, and to distinguish those 7-Eleven® convenience stores and the products and services provided therein from those established, made, offered and sold by others,

7-Eleven has extensively used certain trademarks, service marks, trade names, logos, emblems and indicia of origin (the "7-Eleven Marks"). These marks include 7-Eleven®, Slurpee®, and Big Gulp®, among others.

11. In the case of a traditional franchised 7-Eleven® store, such as those at issue here, 7-Eleven selects the location of each store, purchases the land and constructs the store, or leases an appropriate structure, and prepares the store for operation, including providing all equipment and fixtures necessary for operation. In essence, 7-Eleven presents a franchisee with a complete turn-key physical plant ready for retail operation.

12. The franchisee leases the store and equipment from 7-Eleven, and is granted a license to use the 7-Eleven® Service Mark, related trademarks, trade dress and system of operations (collectively, the "Trademarks"). The franchisee does not acquire ownership of the store, its premises or any of the physical plant, all of which remain the property of 7-Eleven. Rather, the franchisee's primary ongoing financial interest is in the net income derived from the store's operations, which the franchisee draws against on a weekly basis.

13. The franchisee bears all expenses for the day-to-day operation of the store, including the cost of inventory and employee wages. 7-Eleven typically finances the cost of inventory at the store; however, the franchisee is required to maintain a certain equity interest in the operation, typically a minimum of $15,000. In order to secure the financing that 7-Eleven provides to the franchisee, 7-Eleven is given a security interest in, among other things, all of the present and thereafter acquired store inventory, and the proceeds thereof. Each 7-Eleven franchisee executes a security agreement ("Security Agreement") as a part of and supplementing the franchise agreement.

14. As part of its standard franchise agreement, 7-Eleven provides bookkeeping services for the store, which are designed to reflect the financial position of the stores, as well as to determine and account for the franchisee's equity position. 7-Eleven's bookkeeping is based almost entirely on information supplied by the franchisee, and 7-Eleven depends upon the veracity of the franchisee's reporting of such information.

**7-Eleven's Payroll Service**

15. The franchisee is solely responsible for the employment of staff at the store, and all aspects thereof, including the hiring, firing, training, scheduling and supervision of all store employees. The franchisee is solely responsible for complying with all employment-related laws, regulations, and ordinances, including the verification of the workers' immigration status and work eligibility.

16. The franchisee bears all costs associated with labor at the store, including wages, payroll taxes, and worker's compensation insurance. Although the franchisee is responsible for payroll costs incurred in the operation of the store, the franchisee's employees are paid through a payroll service that 7-Eleven provides to its franchisees as part of the overall accounting services provided by 7-Eleven under the franchise agreement.

17. The franchisee submits weekly payroll reports to 7-Eleven, indicating the identities of the franchisee's employees who worked at the store during that particular week, along with the number of hours worked and hourly rates. Using only the information supplied by the franchisee, 7-Eleven processes the payroll for the franchisee -- reporting, withholding and remitting all applicable payroll taxes to the proper authorities --, and then issues payment to the franchisee's individual employees.

18. The employees choose the method of payment. Employees may be paid by direct deposit, check, or via a debit card that is issued to the employee once and then "loaded" with the full amount of his wages on a weekly basis.

**The Parties' Franchise Agreements**

19. Collectively, defendants are the franchisees of ten 7-Eleven® stores across Long Island (the "Stores") pursuant to Store Franchise Agreements entered into with 7-Eleven ("Agreements").

20. Farrukh and/or Bushra Baig or Farrukh's company, Aby's Enterprises ("Enterprises") are the franchisees of eight of the Stores; and Zia is the franchisee of two of the Stores (the "Zia Stores"), as follows:

(a) 7-Eleven Store No. 2423-11194D located at 1316 Middle Country Road, Selden, New York 11784 (the "Selden Store") (Enterprises);

(b) 7-Eleven Store No. 2423-34298A located at 235 Smithtown Blvd., Nesconset, New York 11767 (the "Nesconset Store") (Farrukh);

(c) 7-Eleven Store No. 2423-34450 located at 710 Route 347, Smithtown, New York 11787 (the "Smithtown Store") (Farrukh);

(d) 7-Eleven Store No. 2423-11204G located at 2715 Union St., Islip, New York 11751 (the "Islip Store") (Bushra);

(e) 7-Eleven Store No. 2423-16440D located at 28925 Main Road, Cutchogue, New York 11935 (the "Cutchogue Store") (Farrrukh and Bushra);

(f) 7-Eleven Store No. 2423-20093D located at 74730 Main Rd., Greenport, New York 11944 (the "Greenport Store") (Farrukh and Bushra);

(g) 7-Eleven Store No. 2423-23924C located at 500 Old Town Rd., Port Jefferson Station, New York 11776 (the "Port Jefferson Station Store") (Farrukh and Bushra);

(h) 7-Eleven Store No. 2423-27642D located at 20 West Water Street Shops, Sag Harbor, New York 11963 (the "Sag Harbor Store") (Farrukh and Bushra).

    (i) 7-Eleven Store No. 2423-11218A located at 128 Carleton Ave., Islip Terrace, New York 11752 (the "Islip Terrace Store") (Zia); and,

    (j) 7-Eleven Store No. 2422-32757A located at 128 East Main St., Huntington, New York 11743 (the "Huntington Store") (Zia).

21. True and correct copies of the Agreements are attached hereto as Exhibits A through J, in the order listed above.

22. Under the Agreements, defendants were required to, *inter alia*, (i) actively and substantially participate in the operation of the Store and have full managerial authority and responsibility for the operation of the Store (¶ 31[f]); (ii) devote their best efforts to the business of the Store and to maximizing the Store's sales and Gross Profit (¶ 19[b]); and (iii) maintain a high ethical standard in the conduct of the franchised business and in the operation of the Store (¶ 19[a]).  Additionally, defendants covenanted that they would not commit any act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven® franchisees, the 7-Eleven Image, or the 7-Eleven System (¶23[d][4]).  Pursuant to paragraph 26(a)(5) of the Agreements, the abandonment of a store constitutes a non-curable, material breach thereof.

**Defendants' Felony Indictments On Charges Based Upon Illicit Labor Practices**

23. On or about June 12, 2013, a Grand Jury sitting in the Eastern District of New York issued indictments against the individual defendants on multiple felony counts.  The defendants have been charged with a range of criminal acts, including the harboring of illegal aliens for financial gain, wire fraud, and aggravated identity theft, based upon acts allegedly committed in connection with defendants' operation of their 7-Eleven® stores and otherwise.

24. The indictment against defendants Farrukh and Bushra Baig was docketed to No. 2:13-cr-00351, and the indictment against defendant Azhar Zia was docketed to No. 2:13-

7

cr-00352. True and correct copies of the indictments are attached hereto as Exhibits K and L, respectively.

25. The indictments allege that, over at least a 13-year period, defendants engaged in a scheme and conspired with others to systematically employ scores of illegal aliens at the Stores, and that, in furtherance of the scheme, defendants used dozens of stolen identities to conceal the presence of the illegal aliens on their payroll.

26. Unbeknownst to 7-Eleven, defendants allegedly transmitted false payroll information to 7-Eleven regarding the identities of employees working at the Stores, and the number of hours they worked. 7-Eleven, which relies on the veracity of information submitted to it by the franchisee, processed defendants' payroll, unaware that the information defendants supplied was false.

27. The indictments further allege that defendants required the illegal aliens they employed to reside in residences owned by defendants, and misappropriated significant portions of their employees' wages by retaining custody of their 7-Eleven issued paychecks and debit cards and keeping significant portions of the wages for themselves.

**Post-Indictment Proceedings, Zia's Evasion of Arrest,
and Defendants' Abandonment of the Stores**

28. The arraignment of Farrukh, Bushra, and certain other defendants took place on June 17, 2013. The seriousness of the charges against defendants is such that the court denied bail in the first instance. Subsequently, following a bail hearing held October 4, 2013, Bushra was released on $1.5 million secured bond. Farrukh continues to be denied bail, and remains incarcerated as of the date hereof. *See* Docket Reports for *United States v. Baig et al.*, No. 2:13-cr-00351 and *United States v. Zia, et al.*, No. 2:13-cr-00352 (the "Criminal Proceedings"), attached hereto as Exhibits M and N, respectively, and Minute Entry for

proceedings held October 28, 2013 before Judge Sandra J. Feuerstein: Status Conference as to Farrukh Baig et al., attached hereto as Exhibit O.

29. Upon information and belief, federal agents were unable to find and arrest Zia, and it appears he remains a fugitive as of the date hereof. Numerous court proceedings have taken place in the Criminal Proceedings since June 17, 2013, but Zia has yet to appear at any of them. *See* Exhibit N.

30. The defendants have abandoned their franchises. Since June 17, 2013, none of the defendants has made any attempt to continue or resume operation of their Stores. Zia has not been heard from since June 17, 2013, and apparently cannot be found by federal authorities. Farrukh, who remains incarcerated without bail, likewise has made no contact with 7-Eleven, and has made no effort to participate in the operation of the Stores in any way, either personally or through any manager, agent, or designee. Even Bushra, who was released on bail more than six weeks ago, has not appeared at any of the Stores, has not made contact with 7-Eleven, and has made no effort to participate in the operation of the Stores in any way, either personally or through any manager, agent, or designee.

31. In cooperation with the federal government, and in conformance with the provisions of the Agreements, 7-Eleven assumed operation of the stores and has been operating them continuously since June 17, 2013, when the defendants became involved in felony proceedings. Additionally, pursuant to two Ex Parte Post-Indictment Restraining Orders, filed June 13 and 14, 2013, and issued at the request of the United States Attorney for the Eastern District of New York, 7-Eleven is restrained from making "any payment of amounts due the franchisees" under the Agreements. True and correct copies of the Restraining Orders are attached hereto as Exhibits P and Q. 7-Eleven has fully complied with the Restraining Orders.

Accordingly, defendants are currently neither operating the Stores, nor deriving any money therefrom. They are absent from the franchises in all respects.

**Irreparable Harm to 7-Eleven's Trademarks, Reputation, and Goodwill**

32. Defendants' conduct has directly resulted in extremely negative publicity and harm to 7-Eleven's trademarks, reputation, and goodwill. For example, in a press release issued June 17, 2013, the United States Attorney's Office stated that the arrests were the result of "one of the largest criminal immigrant employment investigations ever conducted by the Department of Justice and the Department of Homeland Security."

33. 7-Eleven featured prominently in the June 17, 2013 press release and press conference. For example, U.S. Attorney Loretta E. Lynch stated that defendants "used 7-Eleven as a platform from which to run elaborate criminal enterprises," and "dispensed wire fraud and identity theft, along with Slurpees and hot dogs." U.S. Attorney Lynch commented that the "7-Eleven franchises seized today will be better known for their big fraud than their Big Gulp."

34. News of the investigation and indictments was widely covered by top-tier, regional and trade publications alike, and by major news outlets, including CNBC, CNN, ABC News, the Associated Press, Dow Jones News Service, Reuters, Bloomberg, The New York Times, The Wall Street Journal, and The Huffington Post.

35. As discussed more fully below, 7-Eleven has also suffered harm to its goodwill as a result of its inability to operate the Stores fully and completely following defendants' abandonment, and stands to suffer additional harm in the near future.

**7-Eleven Is Contractually Entitled To The Appointment Of A Receiver**

36. The Agreements contain multiple provisions supporting the appointment of a Receiver. Pursuant to Paragraph 8(e) of the Agreements, 7-Eleven is entitled "to the appointment of a receiver or similar remedies" upon the franchisee's breach. The provision states as follows:

> <u>Breach of Lease.</u> You and we intend to create only a landlord-tenant/lessor-lessee relationship with respect to the Lease provided herein. If you breach this Agreement, then we will be entitled (in addition to any other rights under this Agreement) to invoke all judicial and other rights and remedies available to a landlord or lessor, at law or in equity, including summary proceedings for possession of leased property; **the right to appointment of a receiver or similar remedies;** and/or the right to terminate, cancel, or declare a forfeiture of this Lease. If you receive notice of breach, non-renewal or termination from us and you fail to vacate the Store and surrender the 7-Eleven Equipment prior to the effective date of termination stated in the notice, then you will be deemed to be a tenant at sufferance and a trespasser, you agree to immediately vacate and surrender the Store and the 7-Eleven Equipment, and you will not be entitled to any notice to quit or vacate.

*See, e.g.*, Exhibit A, ¶ 8(e) (underline in original; bold added).

37. Additionally, pursuant to Paragraph 26(f), 7-Eleven has the right to assume operation of the Stores if the franchisee is "involved in" a felony proceeding which, in 7-Eleven's opinion jeopardizes the operation of the store or the 7-Eleven Image. 7-Eleven has been operating the Stores under this provision for the past five months, and must now seek official judicial recognition of this right so that it can run the stores fully and effectively.

**The Appointment Of A Receiver Is Necessary to Avoid
Imminent Diminution Of 7-Eleven's Interest In The Stores**

38. 7-Eleven has incurred substantial expense in operating the Stores in defendants' absence. Moreover, 7-Eleven has been unable to perform certain functions -- such

11

as renewing Store licenses -- which, absent a court order, can only be performed by the franchisees themselves.

39. Defendants' abandonment of the Stores has already resulted in the inability to sell certain products, critical to the Stores' operation, due to the expiration of defendants' licenses. For example, the liquor license for the Nesconset Store expired on July 31, 2013, because Farrukh made no attempt to renew it, and 7-Eleven was forced to stop selling alcohol at the Store. Accordingly, since July 31, 2013, 7-Eleven has lost its share of the gross profit on sales of beer and wine, together with the companion goods typically sold with those items.

40. 7-Eleven was unable to renew the license itself because Farrukh -- not 7-Eleven -- held the prior license, and there has been no judicial declaration acknowledging 7-Eleven's control and management of the Store.

41. Paragraph 26(f) of the Agreements authorizes 7-Eleven to operate the Stores pending defendants' "involvement" in the Criminal Proceedings. However, the New York State Liquor Authority ("SLA") has informed 7-Eleven that it will not accept such provision as a basis for 7-Eleven to renew defendants' licenses or obtain 7-Eleven's own licenses for the Stores. In fact, the SLA has informed 7-Eleven's representatives that it would require a judicially appointed receiver to recognize any authority, other than franchisees themselves, to grant or renew licenses.

42. It is my understanding that, to continue selling alcohol at the Stores, 7-Eleven must either (i) obtain a judicial declaration that the Agreements are terminated, whereupon 7-Eleven would be free to apply for licenses in its own name, or (ii) secure the appointment of a Receiver with authority to enter into a management agreement with 7-Eleven to

operate the Stores. Through the instant litigation, 7-Eleven ultimately seeks the former relief; but the latter relief is necessary in the interim to avoid imminent irreparable harm and diminution in the value of the property.

43. All 7-Eleven® stores in New York are expected to offer certain standard products, including fresh food, beer and wine, cigarettes, and tobacco. If customers cannot get these products at 7-Eleven, they will go elsewhere, taking the rest of their business with them. Moreover, 7-Eleven's image, reputation, and marks will suffer irreparable harm as a result.

44. The Nesconset Store liquor license has already expired. Several licenses are set to expire on November 30, 2013, including the liquor license for the Huntington Store. Other licenses will expire on various dates thereafter.

45. 7-Eleven owns or holds the master leases to all of the Premises, and has invested substantial resources over many years to develop its reputation and marks in general, and to develop goodwill in these particular locations. The value to 7-Eleven of the locations at issue will be severely diminished by the inability to sell all the products customers expect.

46. The inability to sell the full complement of products -- particularly such items as alcohol and tobacco, which not only represent a significant percentage of sales but which also draw customers in to the Stores -- has had and will have a serious deleterious effect on the overall performance of the Stores, and, therefore, the overall value of the franchises. A store's performance with regard to sales and profitability has long-term effects on 7-Eleven. As a Franchisor, 7-Eleven maintains and grows its business through the sale of franchises and the operation of those franchised stores. When 7-Eleven franchises (or re-franchises) a location, it obtains a franchise fee that is based largely on that particular store's historical performance with

regard to sales and profitability. A store with depressed sales, for any reason, will have a lower value than a store with robust sales.

47. Moreover, a high-performing store is more likely to attract better-qualified franchise applicants, who in turn will maximize sales and profits for years to come. The vast majority of 7-Eleven's revenue comes from the charge imposed upon the franchisee in return for the right to run the franchised store, which charge is measured as a percentage of gross profits from sales. Thus, although 7-Eleven may be able to estimate the short-term monetary harm from lost sales of alcohol, cigarettes, and complementary goods for a given period of time, the long-term effect would be impossible to quantify.

**7-Eleven Has Terminated Defendants' Franchise Agreements**

48. Since at least June 17, 2013, defendants have not been present at the Stores personally. They have made no contact with 7-Eleven, and have made no effort to operate the Stores, either personally or through any manager, agent, or designee. This gave 7-Eleven the right to terminate the Agreements, without opportunity to cure, upon three business days' notice Paragraph 26(a)(5) states:

> Termination by Us. We may terminate this Agreement (subject to your right to cure where stated below) for the occurrence of any one (1) or more of the following events (each of which you acknowledge is a Material Breach and constitutes good cause for termination):
>
> \*   \*   \*
>
> **Upon three (3) Business Days' notice to you, and with no right to cure, if:** (a) you vacate, desert or otherwise abandon the Store (and, immediately after we determine that you have abandoned the Store, we may take possession of the Store pursuant to the provisions of Paragraph 26(f), operate the Store for your benefit during such notice period, and charge your Open Account for Operating Expenses and other costs that we incur in connection with the operation of the Store on your behalf).

14

49. On November 26, 2013, 7-Eleven issued each of the defendants a Non-Curable Notice of Material Breach and Termination of the Agreements (the "Notices of Termination"), on the basis of the conduct hereinabove described. True and correct copies of the Notices are attached hereto as Exhibits R and S.

I hereby certify that the foregoing statements are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Executed at 40 RICHARDS AVE
on November 26, 2013    NORWALK, CT.

_____
Daniel Kaepernik