**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**                    (Electronically Filed)

**7-ELEVEN, INC.,**                                    Civil Action No. _____

                                    **Plaintiff,**      **COMPLAINT**

                        - against -

**FARRUKH BAIG,**
**BUSHRA BAIG, AZHAR ZIA**
**and ABY'S ENTERPRISES LTD.,**

                                    **Defendants.**

        Plaintiff, 7-Eleven, Inc. ("7-Eleven"), for its complaint in the above-entitled

action, alleges, with knowledge as to its own acts, and otherwise on information and belief, as

follows:

<u>**Nature of this Action**</u>

        1.      7-Eleven franchises and licenses 7-Eleven® convenience stores.  The

individual defendants (and the corporate defendant controlled by defendant Farrukh Baig) are

7-Eleven franchisees of an aggregate ten (10) 7-Eleven® convenience stores located in Suffolk

County, New York pursuant to discrete, albeit substantially identical, franchise agreements with

7-Eleven.  On or about June 12, 2013, a Grand Jury convened by the United States Attorney for

the Eastern District of New York issued indictments against the individual defendants on

multiple felony counts --  including the harboring of illegal aliens for financial gain, wire fraud,

and aggravated identity theft --, based upon acts committed in connection with defendants'

operation of their 7-Eleven® stores and otherwise.  The indictments outline a massive conspiracy

to defraud employees, 7-Eleven, the Internal Revenue Service and federal, state and local

government authorities.

2.    On or about June 17, 2013, federal agents and police raided ten 7-Eleven® stores across Long Island, making multiple arrests in connection with the indictments and taking into custody a substantial number of workers believed to have been brought to the country illegally.  These arrests and detainments, coupled with the apparent flight of others involved in the operation of the stores, including defendant Azhar Zia, left the stores essentially deserted and without management.  In cooperation with the federal government, and in conformance with the provisions of defendants' franchise agreements, 7-Eleven assumed operation of the stores and has been operating them continuously since June 17, 2013.

3.    As detailed herein, since June 17, 2013, defendants have not taken any steps to return to the stores or operate them through any designees, managers, or agents. Defendants' abandonment of their stores constitutes a non-curable material breach, justifying termination of their franchise agreements.

4.    7-Eleven herein asserts claims against the defendants for breach of contract and declaratory judgment that defendants' franchise agreements are terminated.

5.    Additionally, 7-Eleven seeks the appointment of a receiver -- either 7-Eleven itself or its designee -- which will permit 7-Eleven to continue managing and operating the stores until such time as 7-Eleven's claims are fully adjudged on the merits, or until other interim relief is granted.

## Jurisdiction and Venue

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and § 1391(b)(1) and (2).

8.     The amount in controversy on each of the counts set forth below exceeds $75,000 exclusive of interest and costs.

## The Parties

9.     7-Eleven is a Texas corporation.  It is authorized to do business in the State of New York.  It is a citizen of Texas.

10.     7-Eleven is the premier name and largest chain in the convenience retailing industry.  Based in Dallas, Texas, 7-Eleven operates, franchises and licenses approximately 10,000 7-Eleven® stores in North America.

11.     Defendant Aby's Enterprises Ltd. ("Enterprises") is a New York corporation with its principal office at 1316 Middle Country Rd., Centereach, New York 11784. It is a citizen of the State of New York.

12.     Defendant Farrukh Baig ("Farrukh"), an individual, is a citizen of the State of New York, residing at 5 Farmers Lane, Head of the Harbor, New York 11780.  He is the President and the sole shareholder of Enterprises.

13.     Defendant Bushra Baig ("Bushra"), an individual and the wife of Farrukh, is a citizen of the State of New York, residing at 5 Farmers Lane, Head of the Harbor, New York 11780.

14.     Defendant Azhar Zia ("Zia"), an individual, is a citizen of the State of New York, residing at 143 River Road, Great River, New York 11739.

3

**Facts Common to All Counts**

**7-Eleven's Registered Trademarks and Service Marks**

       15.    Based upon years of experience, 7-Eleven has developed, and is the sole and exclusive owner of, unique and uniform systems relating to the establishment and operation of 7-Eleven® high-end convenience food stores (the "7-Eleven System").

       16.    The 7-Eleven System is a comprehensive business format for the establishment, operation and development of high-standard convenience food store businesses with distinctive features in products, services, distribution, accounting, training and management assistance. The 7-Eleven System is designed to ensure that 7-Eleven® convenience stores and the services and products offered therein meet uniform, high quality standards. The 7-Eleven System is also designed to protect 7-Eleven's name and reputation. As such, all 7-Eleven franchise agreements require franchisees to comply with the 7-Eleven System in the operation of their 7-Eleven® convenience stores.

       17.    The 7-Eleven System is widely known and favorably recognized by consumers. Consumers choose 7-Eleven because of its high reputation for, *inter alia*, quality and service. The 7-Eleven System is founded upon adherence to 7-Eleven's standards and specifications. To identify the source, origin, and sponsorship of 7-Eleven® convenience stores and the services they offer, and to distinguish those 7-Eleven® convenience stores and the products and services provided therein from those established, made, offered and sold by others, 7-Eleven has extensively used certain trademarks, service marks, tradenames, logos, emblems and indicia of origin, including, but not limited to, the following names and marks (the "7-Eleven Marks"):

| Mark | Registration Number | Effective Date |
|------|---------------------|----------------|
| 7-ELEVEN | 718,016 | 7/4/1961 |
| 7-ELEVEN | 920,897 | 9/21/1971 |

4

| | | |
|---|---|---|
| OH THANK HEAVEN FOR 7-ELEVEN | 1,008,307 | 1/17/1978 |
| SLURPEE | 829,177 | 7/8/1967 |
| BIG GULP | 1,110,172 | 12/26/1978 |
| 7-ELEVEN LOGO AND DESIGN | 896,654 | 8/11/1970 |

18.     7-Eleven has continuously used the 7-Eleven Marks in interstate commerce in connection with the promotion and licensing of 7-Eleven® businesses and the services they offer throughout the United States, including the State of New York, since the date of their registration.

19.     7-Eleven and its authorized franchisees have extensively advertised and promoted 7-Eleven businesses and the services they offer under the 7-Eleven Marks throughout the United States and through various media.  As a result of such efforts and the considerable money spent in connection therewith, the services offered by 7-Eleven and its licensees under the 7-Eleven Marks have met with widespread public approval and have established demand and goodwill among consumers throughout the United States, including the State of New York.

**The Parties' Written Franchise Agreements**

20.     Farrukh entered into a Store Franchise Agreement effective on or about July 1, 2004 (the "Selden Franchise Agreement"), which agreement superseded a franchise agreement effective on or about September 1, 2002, which, in turn, superseded a franchise agreement effective on or about March 9, 1995, pursuant to which, among other things, 7-Eleven leased (or subleased) to Farrukh certain equipment ("Equipment") and real property presently described as 7-Eleven Store No. 2423-11194D located at 1316 Middle Country Road, Selden, New York 11784 (the "Selden Premises").

21.     The Selden Franchise Agreement was assigned to Enterprises, and Farrukh guaranteed the performance of Enterprises under the Selden Agreement.  Hereinafter, reference to "Enterprises" is reference to Farrukh and Enterprises, individually and collectively.  Reference

is made to the Selden Franchise Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

22.     Bushra entered into a Store Franchise Agreement effective on or about July 1, 2004 (the "Islip Franchise Agreement"), which agreement superseded a franchise agreement effective October 11, 2000, pursuant to which, among other things, 7-Eleven leased (or subleased) to Bushra certain Equipment and real property presently described as 7-Eleven Store No. 2423-11204G located at 2715 Union St., Islip, New York 11751 (the "Islip Premises"). Reference is made to the Islip Franchise Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

23.     Farrukh and Bushra entered into a Store Franchise Agreement effective on or about June 1, 2004 (the "Cutchogue Franchise Agreement"), which agreement superseded a franchise agreement effective December 19, 1988, pursuant to which, among other things, 7-Eleven leased (or subleased) to Farrukh and Bushra certain Equipment and real property presently described as 7-Eleven Store No. 2423-16440D located at 28925 Main Road, Cutchogue, New York 11935 (the "Cutchogue Premises").  Reference is made to the Cutchogue Franchise Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

24.     Farrukh and Bushra entered into a Store Franchise Agreement effective on or about June 1, 2004 (the "Greenport Franchise Agreement"), which agreement superseded a franchise agreement effective August 28, 1990, pursuant to which, among other things, 7-Eleven leased (or subleased) to Farrukh and Bushra certain Equipment and real property presently described as 7-Eleven Store No. 2423-20093D located at 74730 Main Rd., Greenport, New York

11944 (the "Greenport Premises"). Reference is made to the Greenport Franchise Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

25. Farrukh and Bushra entered into a Store Franchise Agreement effective on or about July 1, 2004 (the "Port Jefferson Station Franchise Agreement"), which agreement superseded a franchise agreement effective June 25, 1996, pursuant to which, among other things, 7-Eleven leased (or subleased) to Farrukh and Bushra certain Equipment and real property presently described as 7-Eleven Store No. 2423-23924C located at 500 Old Town Rd., Port Jefferson Station, New York 11776 (the "Port Jefferson Station Premises"). Reference is made to the Port Jefferson Station Franchise Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

26. Farrukh and Bushra entered into a Store Franchise Agreement effective on or about June 1, 2004 (the "Sag Harbor Franchise Agreement"), which agreement superseded a franchise agreement effective March 29, 2000, pursuant to which, among other things, 7-Eleven leased (or subleased) to Farrukh and Bushra certain Equipment and real property presently described as 7-Eleven Store No. 2423-27642D located at 20 West Water Street Shops, Sag Harbor, New York 11963 (the "Sag Harbor Premises"). Reference is made to the Sag Harbor Franchise Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

27. Farrukh entered into a Store Franchise Agreement effective on or about December 10, 2009 (the "Nesconset Franchise Agreement"), pursuant to which, among other things, 7-Eleven leased (or subleased) to Farrukh certain Equipment and real property presently described as 7-Eleven Store No. 2423-34298A located at 235 Smithtown Blvd., Nesconset, New York 11767 (the "Nesconset Premises"). Reference is made to the Nesconset Franchise

Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

28. Farrukh entered into a Store Franchise Agreement effective on or about March 14, 2013 (the "Smithtown Franchise Agreement"), pursuant to which, among other things, 7-Eleven leased (or subleased) to Farrukh certain Equipment and real property presently described as 7-Eleven Store No. 2423-34450 located at 710 Route 347, Smithtown, New York 11787 (the "Smithtown Premises"). Reference is made to the Nesconset Franchise Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

29. Zia entered into a Store Franchise Agreement effective on or about June 1, 2004 (the "Islip Terrace Franchise Agreement"), which agreement superseded a franchise agreement effective on or about February 12, 1990, pursuant to which, among other things, 7-Eleven leased (or subleased) to Zia certain Equipment and real property presently described as 7-Eleven Store No. 2423-11218A located at 128 Carleton Ave., Islip Terrace, New York 11752 (the "Islip Terrace Premises"). Reference is made to the Islip Terrace Franchise Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

30. Zia entered into a Store Franchise Agreement effective on or about November 1, 2004 (the "Huntington Franchise Agreement"), which agreement superseded a franchise agreement effective on or about January 9, 2002, pursuant to which, among other things, 7-Eleven leased (or subleased) to Zia certain Equipment and real property presently described as 7-Eleven Store No. 2422-32757A located at 128 East Main St., Huntington, New York 11743 (the "Huntington Premises" or the "Huntington Store"). Reference is made to the Huntington Franchise Agreement, as amended and supplemented, with exhibits, for the full terms and provisions thereof.

31.     Hereinafter (i) the Selden Franchise Agreement, the Islip Franchise Agreement, the Smithtown Franchise Agreement, the Cutchogue Franchise Agreement, the Greenport Franchise Agreement, the Port Jefferson Station Franchise Agreement, the Sag Harbor Franchise Agreement, the Nesconset Franchise Agreement, the Islip Terrace Franchise Agreement and the Huntington Franchise Agreement are collectively sometimes referred to as the "Agreements," and (ii) the Selden Premises, the Islip Premises, the Smithtown Premises, the Cutchogue Premises, the Greenport Premises, the Port Jefferson Station Premises, the Sag Harbor Premises, the Nesconset Premises, the Islip Terrace Premises and the Huntington Premises are sometimes hereinafter collectively referred to as the "Premises" or the "Stores."

32.     Hereinafter, (i) the Islip Terrace Franchise Agreement and the Huntington Franchise Agreement are sometimes collectively referred to as the "Zia Agreements," and (ii) the Islip Terrace Premises and the Huntington Premises are sometimes collectively referred to as the "Zia Stores."

33.     7-Eleven owns or holds the master lease to each of the Premises on which the Stores are located; and 7-Eleven leased or subleased each of the Stores to the defendants pursuant to the terms of the respective Agreements.

34.     Although the Agreements -- there are only three versions covering each of the ten Stores -- have modestly different provisions depending on the date of publication of the particular version comprising each Agreement, insofar as relevant to the issues herein, the applicable provisions are identical in the three versions.

35.     In particular, the Agreements each provide that the franchisees were required to:

      (a)     At all times, use the 7-Eleven Payroll System (as defined in the Agreements) in accordance with 7-Eleven's standards (¶ 19[h]);

(b) Provide 7-Eleven with truthful, accurate and complete information in compliance with all applicable laws and such policies and requirements that 7-Eleven may implement from time to time (¶ 12[c][3]);

(c) Be solely responsible for, and pay, all business, income and personal property taxes related to the Store (¶ 21);

(d) To not, at any time, commit any other act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven® franchisees, or any of 7-Eleven's rights in or to the Service Mark, other trade indicia, including the Related Trademarks, or any copyright or Trade Secret that 7-Eleven owns or licenses, the 7-Eleven Image, or the 7-Eleven System, all as defined in the Agreements (¶23[d][4]);

(e) Maintain a high ethical standard in the conduct of the franchised business and in the operation of the Store (¶ 19[a]); and

(f) Devote their best efforts to the business of the Store and to maximizing the Store's sales and Gross Profit (¶ 19[b]).

36. Paragraph 26(f) of each of the Agreements provides that 7-Eleven may assume operation of the store if the franchisee becomes involved in a felony proceeding that jeopardizes the operation of the store or the 7-Eleven Image. The provision states as follows:

(f) <u>Our Right to Assume Operation of the Store</u>. We may enter the Store premises and take possession of the Store, 7-Eleven Equipment, Inventory, Receipts, Cash Register Fund, money order blanks, bank drafts and Store supplies and continue the operation of the Store for your (or your heirs' or legal representatives') benefit and account pending the expiration or termination of this Agreement or resolution of any dispute under this Agreement if: (1) the Store is not open for operation as provided in Exhibit D; (2) you die or become incapacitated, except as otherwise provided in Exhibit F ("Survivorship"); or (3) in our opinion, a divorce, dissolution of marriage, or felony proceeding in which you are involved jeopardizes the operation of the Store or the 7-Eleven Image. On behalf of yourself, your heirs, and your legal representatives, you hereby consent to our operating the Store pursuant to the terms of this Paragraph 26(f) and agree to release and indemnify us from and against any liability arising in connection with our operation of the Store pursuant to this Paragraph 26(f).

37.     Each of the Agreements defines the 7-Eleven Image as follows:

> "7-Eleven Image" means the acceptance, reputation and goodwill achieved by [7-Eleven] and [7-Eleven's] franchisees in the U.S. and elsewhere that is represented by the Service Mark, and the Related Trademarks for 7-Eleven Stores operated pursuant to the 7-Eleven System and the products and services offered in them.

38.     Paragraph 29(d) of each of the Agreements permits 7-Eleven to seek injunctive or other equitable relief, stating:

> (d)     Either you or we may seek a temporary restraining order, preliminary injunction or any other equitable relief at any time prior to or during the course of a dispute if, in your or our reasonable belief, such relief is necessary to avoid irreparable damage.

39.     Paragraph 8(e) of each of the Agreements gives 7-Eeven the right to appointment of a receiver if the franchisee is in breach of the Agreement.  The provision states in relevant part:

> (e)     <u>Breach of Lease.</u>   You and we intend to create only a landlord-tenant/lessor-lessee relationship with respect to the Lease provided herein. If you breach this Agreement, then we will be entitled (in addition to any other rights under this Agreement) to invoke all judicial and other rights and remedies available to a landlord or lessor, at law or in equity, including summary proceedings for possession of leased property; the right to appointment of a receiver or similar remedies; and/or the right to terminate, cancel, or declare a forfeiture of this Lease.

**7-Eleven and the 7-Eleven System**

40.     In the 48 contiguous states, 7-Eleven is divided into various Zones, each of which has discrete territories designated by 7-Eleven as Markets.  Nine of the Stores are located in what is known as Market 2423 in 7-Eleven's North Atlantic Zone.  These stores, like virtually all of the stores in Market 2423, are located in Suffolk County.  The Huntington Store is located in Market 2422, which encompasses all of Nassau County and a small portion of Suffolk County.

41.     Through its franchise system, 7-Eleven markets, promotes, and provides products and services to its customers throughout the United States.  In order to identify its stores, products and services, 7-Eleven allows its franchisees to utilize the 7-Eleven trademarks and trade names in connection with the operation, advertising and identification of the convenience store.

42.     7-Eleven requires, and the franchise agreement for each store provides for, accounting systems and controls that are designed to provide accountability for the operation of the store, as well as to determine and account for the "equity" position of the franchisee, i.e., the franchisee's net worth in the store's operations, which the franchisee is obligated to maintain above a certain minimum level.

43.     In the case of a traditional franchised 7-Eleven store, such as the Stores, 7-Eleven selects the location of each store, purchases the land and constructs the store, or leases an appropriate structure, and prepares the store for operation, including providing all equipment (shelves, counters, cash registers, lighting and other fixtures, heating and cooling equipment, signs, parking lot preparation, etc.) necessary for its operation.  In essence, 7-Eleven presents a franchisee with a complete "turn-key" physical plant ready for retail operation.

44.     In the case of a traditional franchised 7-Eleven store, under the current, and prior forms of, franchise agreement, a franchisee leases the store and equipment, and is licensed to use the 7-Eleven® Service Mark, related trademarks, trade dress and system of operations (collectively, the "Trademarks").  In such arrangement, a franchisee does not acquire ownership of the store, its premises or any of the physical plant, all of which remain the property of 7-Eleven.  Rather, the franchisee's primary ongoing financial interest is in the net income derived from the store's operations, which the franchisee draws against on a weekly basis.

45.     In a traditional franchised operation, applicable to the Stores, 7-Eleven's essential financial interest is in receiving a percentage of the "gross profit" (net sales less cost of goods sold) derived from operation of the store, which percentage (usually between 50 and 52 percent) is designated in the franchise agreement as the "7-Eleven Charge."  In a traditional franchised 7-Eleven® store, the net income in which the franchisee has an interest is the amount remaining after deducting both (i) operating expenses (such as payroll and similar expenses), and (ii) the 7-Eleven Charge from the gross profit.  In such arrangement, operating expenses do not include certain store repairs, replacement of equipment, insurance, real property taxes, any rental charge, electricity, heat or other utility costs, all of which are borne by 7-Eleven.

**Financing Offered by 7-Eleven to the Franchisee: The Open Account**

46.     In addition to furnishing the store and equipment to the franchisee, 7-Eleven provides bookkeeping services for the store.  If a franchisee requests, 7-Eleven will also provide financing for the operation of the store, pursuant to the terms of the franchise agreement.  Although most franchisees utilize 7-Eleven's financing, they are free to obtain their own financing for the operation of the store.

47.     In order to secure the financing that 7-Eleven provides to the franchisee, 7-Eleven is given a security interest in, among other things, all of the present and thereafter acquired store inventory, and the proceeds thereof.  Each 7-Eleven franchisee executes a security agreement ("Security Agreement") as a part of and supplementing the franchise agreement.

48.     The franchisee is responsible for purchasing the initial inventory for the store and for all subsequent inventory purchases.  However, the franchisee may make its initial inventory purchase by paying only part of the purchase price and using 7-Eleven's financing to pay the balance.  The amount financed by 7-Eleven and the balance due from the franchisee is maintained in an account defined in the franchise agreement as the "Open Account."  The Open

Account reflects any initial inventory financed, and all subsequent purchases and expenses (that are financed by the franchisee through 7-Eleven), as well as revenues, which flow through the Open Account. Essentially, the Open Account is a running working capital account that at any particular point in time reflects the outstanding balance of any unpaid sums that 7-Eleven has loaned or advanced to the franchisee to operate the store.

**Franchisee's Reporting Obligations at the Heart of the 7-Eleven System**

49.     After operation of a store commences, the franchisee is obligated to record accurately all monetary and financial transactions, including sales, purchases, and expenses such as payroll to store employees. First, the franchisee is obligated to ring up all sales made in the store, using, to the extent possible, the POS scanner, including all sales of merchandise, money orders, cigarettes, lottery tickets, and other sales. The cash register automatically maintains a running total for all entries. The franchisee uses the information collected from POS cash register totals for the day to prepare the daily reports a franchisee is required to make to 7-Eleven.

50.     The franchise agreement obligates the franchisee to report all activity of the store on forms and at times specified by 7-Eleven.

**7-Eleven's Payroll Service**

51.     The franchisee is responsible for the employment of staff at the store, and all aspects thereof, including the hiring, firing, training, scheduling and supervision of all store employees.  The franchisee is responsible for all labor and payroll costs in the operation of the store, including payroll taxes and worker's compensation.

52.     The franchisee is solely responsible for complying with all employment-related laws, regulations, and ordinances, including the verification of the workers' immigration status and work eligibility.

53.     Although the franchisee is responsible for the labor and payroll costs in the operation of the store, the franchisee's employees are paid through what is effectively a payroll service that 7-Eleven provides to its franchisees, as part of the overall accounting services provided by 7-Eleven as contemplated by the franchise agreement.

54.     The franchisee submits weekly payroll reports to 7-Eleven, indicating the identities of the employees who worked at the store during that particular week, along with the number of hours worked and hourly rates.

55.     Using the information supplied by the franchisee, 7-Eleven processes the payroll -- reporting, withholding and remitting all applicable payroll taxes to the proper authorities --, and then issues payment to the individual employees.

56.     The employees choose the method of payment.  Employees may be paid by direct deposit, check, or via a debit card that is issued to the employee once and then "loaded" with the full amount of his wages on a weekly basis.

**Defendants' Felony Indictments On Charges Based Upon Illicit Labor Practices**

57.     On or about June 12, 2013, a Grand Jury convened by the United States Attorney for the Eastern District of New York issued indictments against the individual defendants on multiple felony counts based upon acts committed in connection with defendants' operation of the Stores and otherwise.  The indictment against defendants Farrukh and Bushra Baig was docketed to No. 2:13-cr-00351, and the indictment against defendant Azhar Zia was docketed to No. 2:13-cr-00352.

58.     The indictments allege that, over a 13-year period, defendants engaged in a scheme and conspired with others to systematically employ scores of illegal aliens at the Stores, and that, in furtherance of the scheme, defendants used dozens of stolen identities to conceal the presence of the illegal aliens on their payroll.  The felony charges against defendants include the harboring of illegal aliens for financial gain, wire fraud, and aggravated identity theft.

59.     Unbeknownst to 7-Eleven, defendants transmitted false payroll information to 7-Eleven regarding the identities of employees working at the Stores, and the number of hours they worked.  7-Eleven in turn processed defendants' payroll, all the while unaware that the information defendants supplied was fraudulent.

60.     The indictments further allege that defendants required the illegal aliens to reside in what amount to "stash houses," and misappropriated significant portions of their wages by retaining custody of their 7-Eleven issued checks and debit cards and keeping significant portions of the wages for themselves.

## Post-Indictment Proceedings and Zia's Evasion of Arrest

61.    The arraignment of Farrukh, Bushra, and certain of their co-conspirators took place on June 17, 2013. The seriousness of the charges against defendants is such that the court denied bail at that time.

62.    Subsequently, following a bail hearing held October 4, 2013, Bushra was released on $1.5 million secured bond.  Farrukh continues to be denied bail, and remains incarcerated as of the date hereof.

63.    Federal agents were unable to find and arrest Zia, and he remains at large as of the date hereof.  Numerous court proceedings have taken place in the Criminal Proceedings since June 17, 2013, but Zia has yet to appear at any of them.

## Defendants' Abandonment of the Stores

64.    Since June 17, 2013, none of the defendants have made any attempt to continue or resume operation of the Stores.

65.    Zia has not been heard from since June 17, 2013, and apparently cannot be found by federal authorities.

66.    Bushra, who was released on bail more than six weeks ago, has not appeared at any of the Stores, has not made contact with 7-Eleven, and has made no effort to participate in the operation of the Stores in any way, either personally or through any manager, agent, or designee.

67.    Farrukh, who remains incarcerated without bail, has not made contact with 7-Eleven, and has made no effort to participate in the operation of the Stores in any way, either personally or through any manager, agent, or designee.

68.     In cooperation with the federal government, and in conformance with the provisions of defendants' franchise agreements, 7-Eleven assumed operation of the stores and has been operating them continuously since June 17, 2013.

69.     7-Eleven has incurred substantial expense in operating the Stores in defendants' absence.  Moreover, defendants' abrupt departure has negatively affected sales volume at the Stores, and therefore 7-Eleven has suffered losses in the form of its share of the gross profits from the lost sales.

70.     By way of example, the liquor license for the Nesconset Store expired on July 31, 2013, because Farrukh made no attempt to renew it.  7-Eleven was forced to stop selling alcohol at the Store.  Accordingly, since July 31, 2013, 7-Eleven has lost its share of the gross profit on sales of beer and wine, together with the companion goods typically sold with those items.  7-Eleven was unable to renew the license itself because Farrukh held the prior license, and there has been no judicial declaration acknowledging 7-Eleven's control and management of the Store.

**Negative Publicity and Harm to 7-Eleven's Trademarks, Reputation, and Goodwill**

71.     Defendants' conduct has directly resulted in extreme negative publicity and harm to 7-Eleven's trademarks, reputation, and goodwill.

72.     On June 17, 2013 at 11 a.m., United States Attorney Loretta E. Lynch held a press conference in Brooklyn, New York, to announce the filing of charges and arrest of multiple defendants in what the United States Attorney's Office, in its Media Advisory, termed a "major alien harboring and identity theft case."

73.     In a press release issued June 17, 2013, the United States Attorney's Office stated that the arrests were the result of "one of the largest criminal immigrant employment

investigations ever conducted by the Department of Justice and the Department of Homeland Security." The press release went on to state that the case constitutes "the largest criminal immigration forfeiture" in the history of the Department of Homeland Security.

74. 7-Eleven featured prominently in the June 17, 2013 press release and press conference, in which U.S. Attorney Lynch stated that defendants "used 7-Eleven as a platform from which to run elaborate criminal enterprises," and "dispensed wire fraud and identity theft, along with Slurpees and hot dogs." U.S. Attorney Lynch commented that the "7-Eleven franchises seized today will be better known for their big fraud than their Big Gulp."

75. News of the investigation and indictments was covered by top-tier, regional and trade publications alike, and by major news outlets, including CNBC, CNN, ABC News, the Associated Press, Dow Jones News Service, Reuters, Bloomberg, The New York Times, The Wall Street Journal, and The Huffington Post.

76. 7-Eleven has also suffered harm to its goodwill as a result of its inability to operate the Stores fully and completely following defendants' abandonment. As set forth in paragraph 70, above, defendants' abandonment of the Stores has resulted in the inability to sell certain products at the Stores. The inability to sell the full complement of products -- particularly such items as alcohol and tobacco which not only represent a significant percentage of sales but which also draw customers in to the Stores -- has had and will continue to have an extremely deleterious effect on the overall performance of the Stores, and, in turn, the value of the franchises.

## COUNT ONE
### (Against All Defendants -- Breach of Contract)

77. 7-Eleven repeats and reiterates the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

19

78. The Franchise Agreements require the franchisee to participate actively and substantially in the operation of the Store, as follows:

> Personal Qualification. We are entering into this Agreement with the person(s) named as the "Franchisee(s)" on the signature page; in reliance upon his, her or their personal qualifications; and upon the representation and agreement that he, she or they agree to be the Franchisee(s) of the Store, will actively and substantially participate in the operation of the Store and will have full managerial authority and responsibility for the operation of the Store. No changes in the ownership and/or control of the franchise may be made without our advance written consent. Any person(s) subsequently added as a "Franchisee" in a writing signed by the parties must likewise actively and substantially participate in the operation of the Store and have full managerial authority and responsibility for the operation of the Store.

79. Defendants further covenanted and agreed, among other things, that they would:

(a) Not commit any act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven franchisees, the 7-Eleven Image or the 7-Eleven System (as defined in the Franchise Agreements);

(b) Devote their best efforts to the business of the Stores and maximization of the Stores' sales and gross profit, and cause the Stores to be operated only pursuant to the 7-Eleven System and in a manner that will enhance the 7-Eleven Image; and

(c) Maintain a high ethical standard in the conduct of the franchised business and in the operation of the Stores.

80. Defendants materially breached the Franchise Agreements and failed substantially to comply with their aforesaid obligations under the Franchise Agreements in the particulars above described.

81. The Franchise Agreements provide, at paragraph 26(a)(5), that the abandonment of a store constitutes a non-curable, material breach thereof.

82. 7-Eleven has duly performed all of the obligations on its part to be performed under the Franchise Agreements.

83.     7-Eleven has suffered harm as a result of defendants' aforementioned material breaches of the Franchise Agreements, including but not limited to the loss of profits from the sale of merchandise, increased expenses incurred in operating the Stores in defendants' place, and harm to 7-Eleven's reputation and goodwill.

84.     By reason of the foregoing, 7-Eleven has suffered damages in a precise amount to be determined at trial but not less than $150,000.

## COUNT TWO
### (Against All Defendants -- Declaratory Judgment)

85.     7-Eleven repeats and reiterates the allegations contained in paragraphs 1 through 84 as if fully set forth herein.

86.     Since at least June 17, 2013, defendants have not been present at the Stores personally.  They have made no contact with 7-Eleven, and have made no effort to operate the Stores, either personally or through any manager, agent, or designee.

87.     The Franchise Agreements provide, at paragraph 26(a)(5), that the abandonment of a store constitutes a non-curable, material breach and justifies the termination of the Franchise Agreements.

88.     Upon information and belief, defendants contend that 7-Eleven has no basis to terminate the Franchise Agreements.

89.     Actual, existing and justiciable controversies have arisen and exist between 7-Eleven, on the one hand, and defendants, on the other, regarding the continuing validity and efficacy of the Franchise Agreements.

90.     7-Eleven has no adequate remedy at law.

**WHEREFORE**, 7-Eleven demands that a judgment be entered in its favor, as follows:

1.      On Count One, against all defendants, awarding 7-Eleven compensatory damages in a precise amount to be determined at trial.

2.      On Count Two, that the Court determine and declare that (i) the Franchise Agreements are terminated and that 7-Eleven is legally entitled to possession of the Stores, together with the equipment and merchandise inventory therein, and (ii) Defendants have no further rights in or to any of the aforementioned Stores or under the Franchise Agreements.

3.      That a Receiver be appointed over the Stores pending judgment on 7-Eleven's claims.

4.      That 7-Eleven be awarded such other and further relief as the Court may deem just and equitable.


Dated:      New York, New York
            November 15, 2013

                          **DUANE MORRIS LLP**


                          By: /s/ Susan V. Metcalfe
                              Stephen Sussman (SS-1072)
                              E-mail:    ssussman@duanemorris.com
                              Susan V. Metcalfe (SVM-4694
                              E-mail:    svmetcalfe@duanemorris.com


                              1540 Broadway
                              New York, NY 10036-4086
                              Telephone: +1 212 692 1000
                              Fax: +1 212 692 1020

                              *Attorneys for Plaintiff, 7-Eleven, Inc.*